**\*Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

VINCENT SGRO, ALBERT BASSANO,
VERA STEK and ANN WALKER,

Plaintiffs,

v.

BLOOMBERG L.P.,

Defendant.
_____

Civil Action No. 05-731(FLW)

**OPINION**

**WOLFSON, District Judge**:

Plaintiffs, Vincent Sgro ("Sgro"), Albert Bassano ("Bassano"), Vera Stek ("Stek") and Ann Walker ("Walker")(collectively, "Plaintiffs"), current and former Defendant Bloomberg L.P.'s ("Bloomberg") employees with disparate histories and experiences have joined together to allege a variety of claims against Bloomberg arising under the New Jersey Law Against Discrimination ("NJLAD"). Specifically, Plaintiffs allege age and disability discrimination, retaliation, and sexual harassment. In the instant matter, Bloomberg moves for summary judgment on all counts. For the forgoing reasons, Defendant's motion is granted in its entirety.

### BACKGROUND

Plaintiffs Sgro, Bassano and Stek

Plaintiffs Sgro and Bassano joined Bloomberg in February 1991 when Bloomberg purchased Petroleum Publications, Inc., a publishing company in which these plaintiffs were partners.

1

Plaintiffs' Statements of Undisputed Material Facts ("Plaintiffs' Statements") at ¶ 1.  Sgro and Bassano had experience in publishing, writing, and editing their own publications, and also had worked for McGraw-Hill Publishing in the 1960's as editors of an oil publication.  Defendant's Statements of Undisputed Material Facts ("Defendant's Statements") at ¶ 2.  When Bloomberg purchased Petroleum Publications, Inc., in 1991, it agreed to employ Sgro and Bassano for three years.  Id. at ¶ 3.  In February 1994, both Sgro and Bassano remained at Bloomberg after their contract had expired, as at-will employees.  Id. ¶ 6.  However, Sgro was working part time.

Bassano initially worked in Bloomberg's Energy Department, continuing to work on the same publication that Bloomberg purchased in the Petroleum Publications transaction.  Plaintiffs' Statements at ¶ 7.  In the 1990's, the Energy Department became a part of Bloomberg News.  Defendant's Statement at ¶ 8.  While a member of Bloomberg News, Bassano started to write a wine column for Bloomberg Service.[1]  Defendant's Statements at ¶ 9.  Around the same time, Sgro began writing, and had a substantial responsibility in, an arts and collectibles column for Bloomberg News, focusing on markets for collectibles such as coins and stamps.   Defendant's Statements at ¶ 11; Plaintiffs' Statements at ¶ 11.  In October 1995, Bloomberg News hired Plaintiff Stek, 43 years old, to work part-time editing news articles.  Defendant's Statements at ¶¶ 12, 13.  She became a full time employee in 2000.  Id. at ¶ 14.

In and around April 1997, Sgro, Bassano and Stek became members of Bloomberg's Lifestyles Department ("Lifestyles"), a group separate from Bloomberg News that published articles

---

[1]The parties dispute Bassano's training and expertise on wine.  Defendant argues that Bassano's knowledge about wine is that of a hobbyist, while Bassano states that he is a widely published, international expert on wine.  Nevertheless, the undisputed fact is that Bloomberg selected Bassano to write about wine while he was working for the Bloomberg News division.

for Bloomberg Service about arts, collectibles and related topics.[2]  Defendant's Statements at ¶ 15.
While Stek continued to edit Bloomberg News articles, she also edited Lifestyles articles and wrote
a weekly review of cookbooks.  Id. at ¶ 17; Plaintiffs' Statements at ¶ 17.  However, concerned with
the lack of review by Bloomberg News personnel prior to publication, John McCorry, Bloomberg
News' managing editor, contacted Stek multiple times in 2001 about editing and content issues with
Lifestyles' articles and requested to review them.  Defendant's Statements at ¶ 20; Plaintiffs'
Statements at ¶ 20.  This prompted Sgro, who was writing Lifestyles' articles, to send an email to
McCorry protesting the imposition of financial reporting rules to Lifestyles' articles, which were
"fun" and ca readings, unlike news articles.  See Horan Cert. at Ex 17.

After their June 2001, a Lifestyles writer, not one of the plaintiffs, published on Bloomberg Service
an article that erroneously reported certain facts regarding the Cuban cigar import regulations.
Plaintiffs' Statements at ¶¶ 22-24; Defendant's Statement at ¶¶ 22-25.  While the parties dispute the
facts underlying this article, it is undisputed that following this incident, the entire Lifestyles
department was transferred into Bloomberg News under the direct supervision of McCorry and Matt
Winkler, the Editor-in-Chief of Bloomberg News.[3]  Id.

After their July 2001 transfer to Bloomberg News, Sgro and Bassano continued to publish
articles on topics like collectibles and wine.  A meeting was held on September 5, 2001, wherein

_____

[2]Sgro testified that he approached Bloomberg and proposed the institution of an arts and
leisure function on the Bloomberg terminal, emphasizing culture, art, collectibles, stamps and
rare coins.  Sgro's Aff. at ¶ 10.  Sgro further testified that this proposal was the foundation for
Lifestyles.  Id.

[3]Plaintiffs allege that after the Cuban Cigar article incident, Lifestyles writers were
instructed not to write stories, and "could only publish six lines of content, copied directly from a
third party source without attribution."  Sgro's Aff. at ¶ 14; Plaintiffs' Statements at ¶ 27.

McCorry criticized the work produced by Lifestyles writers as substandard and restricted their responsibilities. Defendant's Statement at ¶ 30. Consequently, Sgro, Bassano and Stek voiced their complaints about the disparate treatment that they alleged they were experiencing. According to Plaintiffs, because of the complaints, they had to compile a list of victims of the September 11th tragedy (which Plaintiffs euphemistically called the "Death List"); this they assert was demeaning and demoralizing to them. Plaintiffs' Statements at ¶ 31. Bloomberg, however, has indicated that other Bloomberg News employees also worked on the victims' project.[4] Defendant's Statement at ¶ 36.

In November 2001, Sgro and Bassano transferred to Bloomberg's Global Data Group ("Global Data"). Id. at ¶ 37. During the same period, Stek began a medical leave, and upon her return, she was also transferred to Global Data.[5] Id. at ¶ 38. At Global Data, Sgro, Bassano, and Stek worked in the web indexing group under the supervision of Gail Gross. Id. at ¶ 40. To demonstrate the allegedly menial work that they were required to do, Sgro, Bassano and Stek claim that they worked on a project involving adding "1" to area codes of phone numbers available on Bloomberg Service. However, Bloomberg has indicated that this necessary task was shared among Global Data employees, including Plaintiffs' supervisor, Ray Whitman. Plaintiffs' Statement at ¶

---

[4]Bloomberg asserted that the following employees also worked on the victims' project: Holly M. Sanders, J. Kyle Foster, Chitra Somanyaji, Rachel Katz, Todd J. Schriber, Chris Dolmetsch, Chirstoper Mumma and Bob Kuzbyt. Defendant's Statement at ¶ 36. It is important to note that Plaintiffs do not suggest that only older employees were instructed to work on the list.

[5]During her employment, Stek was acquainted with an employee in Bloomberg's Human Resources Department named Jim Neary. Stek alleges that during several conversations with Neary at the cafeteria at Bloomberg, she was subjected to harassing comments pertaining to her gender. Stek testified that she attempted to avoid Neary after she transferred to Global Data in late 2001 or early 2002. See Stek's Dep. at pp. 151, 153.

46.

In addition to the work they performed at Global Data, Sgro, Bassano, and Stek also assisted Bloomberg's New York office in the development and implementation of lifestyle-related events and seminars, including wine tastings, cooking demonstrations and lectures. However, sometimes in 2004, Bassano, Sgro and Stek were relieved of involvement with the seminars. See Bassano's Dep. at p.138. In February 2004, Bloomberg also replaced Bassano with John Mariani, a well-known restaurant critic and food expert, on the Money Show. Defendant's Statements at ¶ 45. The show was a wine segment on Bloomberg's radio show.[6] Id. ¶ 44.

Stek left Bloomberg in May 2003 for health reasons. Id. at ¶ 51. Thereafter, Sgro and Bassano were transferred in July 2004 to the prospect/products development ("PROS") team under the indirect supervision of Ray Whitman. Id. at ¶ 53. Bloomberg claims that the decision to transfer them was based on a determination by senior management that the PROS group in Global Data required additional resources. Id. at ¶ 54. Beginning no later than the summer of 2004, Sgro's managers and HR personnel repeatedly requested that Sgro work a full-time schedule of five days a week after having worked part time since 1991. Defendant's Statement at ¶ 56. Bloomberg asserts that in 2004, all members of Data were required to work full-time. Id. at ¶ 57. However, Sgro refused to work full time. In August 2004, Sgro began a medical leave. Around the same time, Bloomberg dissolved Lifestyles and created a new department called Muse News, which was headed

---

[6]To further demonstrate discrimination, in 2002 or 2003, Sgro and Bassano claim that they were told that they could not bring their grandchildren to Bloomberg's annual picnic because of space restraints. Plaintiffs' Statements at ¶ 48.

by 58-year old Manuela Hoelterhoff.[7]  Upon his return in February 2005, Sgro continued to refuse

to work full-time.  Id. at ¶¶ 59-61.  A month after his return to work, Bloomberg terminated Sgro on

March 21, 2005, citing Sgro for a negative attitude, persistent complaints that his work was beneath

him, and the resulting negative effect on his co-workers' morale.  Defendant's Statement at ¶ 62.

Bassano remains employed by Bloomberg.

Plaintiff Walker

Walker became a full-time employee at Bloomberg in October 2000 after having performed

some free-lance work for Bloomberg.  Id. at ¶ 67.  She started in the Creative Services Department

when she was 47 years old.  In the summer of 2001, some of Walker's department was relocated to

New York from Princeton.  Walker was given a choice to relocate to New York, but she declined

for personal reasons.  Plaintiffs' Statements at ¶ 70.  As an alternative, Bloomberg offered Walker

work in Global Data doing web indexing in the area of art research; she accepted.  See Walker's

Dep. at pp. 39-40.  Around October 2001, Gail Gross became Walker's Manager.  However, in the

Spring of 2002, Walker believed that her personal situation permitted a move to the New York

office, and thus, she inquired about a new position in her old department in Creative Services.

Instead, in October 2002, Walker became a part of the Creative Strategy team in Global Data.

In July 2002, Bloomberg requested that Walker participate in a Goal Call program, under

which Bloomberg employees "cold called" existing clients to inquire about their experience with

Bloomberg services.  Defendant's Statements at ¶ 77; Plaintiffs' Statements ¶ 77.  However,

Bloomberg temporarily excused Walker from the program because she claimed to suffer from an

---

[7]Hoelterhoff won the Pulitzer Prize in 1983 for Criticism for her "wide-ranging critisim
on the arts and other subjects."  Defendant's Statement at ¶ 66.

anxiety condition.  Defendant's Statement ¶ 78.  Walker presented the opinion of her treating physician to Bloomberg as evidence of her medical condition.  Plaintiffs' Statements at ¶ 78.  In February 2003, HR requested Walker to provide supplemental medical documentation regarding her condition.  Walker objected to the request and never provided any additional documentation.  Id. at ¶ 79.  Nonetheless, Walker testified that she never had to participate in the Goal Call program after July 2002.  See Walker's Dep. at p. 194.

The Creative Strategy team disbanded in September 2004.  After the disbandment, Walker attempted to transfer to various positions within Bloomberg but her efforts were unsuccessful.  Defendant's Statements at ¶ 83.  Walker asserts that Bloomberg told her that she was "not a fit."  Plaintiffs' Statement at ¶ 83.  Beginning on November 9, 2004, Walker started a medical leave for depression and anxiety.  Defendant's Statements at ¶ 84.  She still remains on leave.

## DISCUSSION

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002)(citations omitted).

## I. Plaintiffs' Age Discrimination and Retaliation Claims pursuant to the NJLAD

### A.       Statute of Limitations

Claims arising under the New Jersey Law Against Discrimination are subject to a two-year statute of limitations.  Montells v. Haynes, 133 N.J. 282, 286 (1993); see N.J.S.A. 10:5-1.  However, New Jersey recognizes the "continuing violation doctrine," which provides that when an individual experiences a "continual, cumulative pattern of tortious conduct" the limitations period begins only when the wrongful action ceases.  Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999).  The doctrine is based upon the premise that the conduct becomes tortious and actionable precisely because "of its continuous, cumulative, synergistic nature." Id. at 273 (quotations omitted).  The New Jersey Supreme Court has explained in Wilson that "the cumulative effect of a series of discriminatory or harassing events represents a single cause of action for tolling purposes and that the statute of limitations period does not commence until the date of the final act of harassment." Id. at 273.

The New Jersey Supreme Court in Wilson listed several examples from rulings of others

courts whereby the continuing violation doctrine would apply: Paine v. Department of Mental Health Servs., No. 92-2953, 1995 U.S. Dist. LEXIS 1594, at *16 (N.D.Cal. Feb. 7, 1995) (noting that "sexual harassment can involve a series of acts which only cumulatively alert one to a legitimate claim for sexual harassment."); Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 440 n. 11 (Minn.1983) (finding continuing violation "when the discriminatory acts of an employer over a period of time indicate a systematic repetition of the same policy and constitute a sufficiently integrated pattern to form, in effect, a single discriminatory act."); Cyrus v. Nero, 546 N.E.2d 328, 331 (Ind. Ct. App.1989) (observing that when the wrong is continual, "statute of limitations is tolled so that it does not commence running until the wrongful act ceases."); Collins v. Willcox, Inc., 600 N.Y.S.2d 884, 886 (Sup.Ct.1992) (recognizing that continuing sexual harassment claim's aggregate effect can give rise to a claim of emotional distress).

However, the doctrine does not apply to NJLAD claims unless plaintiff proves that "the defendant's conduct is more than the occurrence of isolated or sporadic acts." Brannick v. New Jersey, No. 6-356, 2006 WL 3095862, at *5 (D.N.J. 2006)(internal quotations and citations omitted). As recently as May 2007, the United States Supreme Court reinforced this concept by stating that "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed," and the acts occurring during the charging period do not save the acts occurring outside the charging period. Ledbetter v. Goodyear Tire & Rubber Co., Inc., 167 L. Ed. 2d 982, 992 (2007). Enforcing the short statute of limitations is important because "the employer's intent is almost always disputed, and evidence relating to intent may fade quickly with time . . . . [Determining intent] can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually

9

happened."[8]  Id. at 994.

Demotions, reductions in pay, failures to promote, office moves to undesirable locations, undesirable assignments, transfers to dead-end jobs, transfers with reduction in pay, and compensation decisions are all discrete acts, and are not subject to the continuing violation doctrine. See, e.g., Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 19-21 (2002); Bolinger v. Bell Atl., 330 N.J. Super. 300, 308 (App. Div. 2000)("plaintiff's placement on half-pay disability status was a discrete event in the same manner as a termination or denial of a promotion"); Harel v. Rutgers, 5 F. Supp. 2d 246, 262 (D.N.J. 1998)("distinct decisions against promotion" are "discrete acts instead of an ongoing practice or policy of discrimination").  Indeed, the New Jersey Supreme Court in Shepherd differentiated individual discriminatory acts, for which the employee must allege a separate charge for each act, and a hostile work environment claim.  Shepherd, 174 N.J. at 19.  The Court will first analyze Plaintiffs' claims for discrimination, retaliation and harassment under the NJLAD to determine whether the two-year statute of limitations acts as a bar to any of these claims.[9]

Since Plaintiffs filed their Complaint on February 7, 2005, the statute of limitations bars their NJLAD claims based on events that occurred before February 7, 2003 if the continuing violation doctrine cannot be invoked.  The Court finds that because the nature of Plaintiffs' allegations

---

[8]Although Ledbetter arose under the Title VII of the Civil Rights Act of 1964, New Jersey courts have noted that the legal standards governing NJLAD claims generally are the same as those governing Title VII cases.  See Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990)("In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority").

[9]The standard for applying the statute of limitations in the context of a hostile work environment claim is different than those for discrimination and retaliation.  As such, later in the Opinion, the Court will analyze the standard pertaining to Plaintiffs' hostile work environment claim.

pertaining to their age discrimination and retaliation claims are separate and discrete, the continuing violation doctrine does not apply to save those alleged incidences.  Specifically, Sgro's, Bassano's and Stek's age discrimination claims primarily concern the dissolution of Lifestyles and their transfer into Bloomberg News  in 2001; their subsequent transfer from Bloomberg News to Global Data in 2001; and the allegedly demeaning assignments in Global Data in 2001 and 2002, including Plaintiffs' 2001 assignment of compiling a list of the September 11th victims (which was referred to as the "Death List").  The following discrete acts pertaining to Walker are also barred: the reassignment of Creative Services to the New York office in 2001; and Bloomberg's alleged discouragement of Walker to apply for a new position in Creative Services in 2002.  Similarly, Stek's independent sexual harassment claim also falls outside the statutory time limit since the allegedly harassing statements made by Neary to Stek occurred before late 2001 and early 2002 when Stek transferred to Global Data.

Relying on cases outside of this circuit, Plaintiffs argue that there are two types of continuing violations that are recognized in the federal context: "systemic" and "serial violations."  Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Opposition") at pp.17-18.  They argue in broad brush fashion that Defendant's allegedly discriminatory discrete acts are subject to the continuing violation doctrine because they are all related to each other and because Bloomberg has a discriminatory policy and practice.  The Court finds their argument unpersuasive.  The Supreme Court, in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), discounted the very argument that Plaintiffs are advancing here.  By rejecting the "serial" violations theory, the Court held that the continuing violation doctrine does not apply to claims based on discrete acts, regardless of their relationship to each other.  Id. at 113-14. Indeed, "discrete discriminatory acts are not

11

actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."  Id. at 113. Accordingly, the alleged discrete acts referenced above are time barred.

## B.  Age Discrimination

An employee must prove four elements to establish a prima facie case of age discrimination: (1) the employee is 40 or over; (2) the employee was qualified for the job; (3) the employee suffered an adverse employment action; and (4) the employer chose a sufficiently younger candidate over the employee.  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004); Bohl v. Fed. Express Corp., No. 03-5942, 2005 WL 1334627, at *4 (D.N.J. Jun. 3, 2005).  Where a plaintiff offers no evidence that younger employees replaced him or her, plaintiff would be deemed as not having satisfied his or her burden of establishing a prima facie case.  Bohl, 2005 WL 1334627 at *4 (finding no prima facie case where the plaintiff could not prove that he was replaced by a sufficiently younger person); Teamsters v. United States, 431 U.S. 324, 358 (1977).

Defendant does not dispute that the first three elements of the prima facie case are met here. Plaintiffs, during the relevant time period, were all over 40 years old and they were qualified for the positions they held.  The remaining alleged adverse employment actions which are not time-barred, are as follows:  the alleged stripping of Plaintiffs' involvement in seminars and lectures sometimes in 2004; Sgro's and Bassano's transfer to the PROS team in July 2004; Bloomberg's decision to terminate Sgro allegedly because he refused to work part time and his negative attitude around the office; the decision to replace Bassano from Bloomberg's radio show in February 2004; and the disbandment of Walker's team at Creative Strategy in September 2004, at which time Walker's attempts to find another position at Bloomberg were unsuccessful.  Finally, to meet their burden,

Plaintiff must show that younger employees replaced them in their respective positions. Plaintiff has failed to meet this last requirement.

Plaintiffs, in a conclusory manner, allege that they were replaced by obviously youthful staffers under the age of 40 and were denied transfers to positions in favor of younger employees. To substantiate their claims, Plaintiffs in sworn affidavits state that the work of the former Lifestyles group was given to Linda Sandler, 38 years old (Ms. Sandler was actually **58 years old**), Richard Blackden, 29 years old, Nancy Morgan, 29 years old and Andrea Friedli, 34 years old. Plaintiffs support their assertions that they were replaced by these allegedly younger workers by pointing to four Bloomberg articles from 2005 and 2006, each one authored by one of these four supposed "younger" employees, together with printouts of their images from the Bloomberg System. The Court finds that such evidence is insufficient to raise a genuine issue of material fact that these "younger" employees in fact replaced Plaintiffs.

First, the evidence is not specific as to exactly at what point these younger employees allegedly replaced Plaintiffs. In reviewing the record, it appears that Sgro, Bassano and Stek were transferred to Global Data where they allegedly were doing work that was inconsistent with their training. It also appears that Plaintiffs are arguing that the younger employees replaced them at that time. However, Sgro, Bassano and Stek were transferred to Global Data in November 2001. If they were replaced at that time, then this alleged discriminatory act is time-barred. To the extent that Plaintiffs claim that these employees replaced them after February 2003 – more than a year later – the evidence is insufficient to show that these younger employees in fact took their positions. For example, that Ms. Friedli wrote a single article about a Swiss art museum in June 2006 hardly establishes that she "replaced" any of the Plaintiffs when Lifestyles was disbanded five years

13

earlier.  In addition, contrary to Plaintiffs' assertion, Ms. Sandler is not 38 years old, but is in fact

58 years old.  As with many of the assertions Plaintiffs make, the "facts" seem to be more conjectural

– or even wishful thinking – than factual.  On a summary judgment motion the Court will not give

credence to Plaintiffs' allegations that essentially amount to "self-serving conclusions" that are

unsupported by specific facts in the record.  See Robertson v. Allied Signal, Inc., 914 F.2d 360, 382

(3d Cir. 1990).  Plaintiffs simply fail to offer any evidence that younger employees replaced them

with respect to any of the specific positions they held or their job responsibilities at Bloomberg.

Rather, the record tends to show that the particular employment actions alleged by Plaintiff

were not discriminatory in nature.  Each Plaintiff was over 40 years old when Bloomberg hired him

or her: Sgro and Bassano were 49; Stek was 40; and Walker was 47.  Such facts strongly counter

against an inference of age discrimination under NJLAD.  See Young v. Hobart West Grp., 385 N.J.

Super. 448, 461 (App. Div. 2005)("Courts have rejected age discrimination claims when a plaintiff

was both hired and fired while a member of the protected age group"(citations omitted)).  Moreover,

Plaintiffs' speculation of discrimination is belied by the fact that the only decision makers to whom

Plaintiffs attribute discriminatory animus were themselves over 40 - Winkler, McCorry and Mazzeo

were all over 40 years old at the time of the events in question.  See Drummed v. IPC Int'l, Inc., 400

F. Supp. 2d 521, 532 (E.D.N.Y. 2005)("a well-recognized inference against discrimination exists

where the person who participated in the allegedly adverse decision is also a member of the same

protected class").  More compelling is the fact that Bloomberg's Muse News team, which replaced

Lifestyles after it was dissolved, was headed by Hoelterhoff, who was 58 years old at the time.  In

fact, 12 of the 13 Muse News employees are over 40; eight are over 50, and one is over 60.  See

Wheatley Supp. Cert. at ¶ 3.

Walker (who was not a part of Lifestyles), supports her claim that she was replaced by younger employees, by stating that her "previous Creative Services art duties were reassigned to young workers in the 'CUBE-D' (formerly creative services)[,] an area to which I was denied transfer by Bloomberg."  Walker Cert at ¶ 11.  Despite the opportunity for full discovery, Walker does not identify any "younger workers" by name or age.  Again, the Court cannot rely on Walker's vague and unsupported assertion.  See Fireman's Ins. Co. v. Dufresne, 676 F.2d 965, 969 (3d Cir. 1982)(party opposing summary judgment should set forth specific facts demonstrating that there is a genuinely disputed factual issue for trial).  Even construing the factual allegations in the light most favorable to Plaintiffs, there is simply insufficient evidence to show that any of the Plaintiffs were replaced by a younger employee in their respective positions.

Even if Plaintiffs were able to establish a prima facie case for discrimination, they have failed to rebut Defendant's legitimate reasons for the employment actions taken.  Indeed, if Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's action. McDonnell Douglas Corp v. Green, 411 U.S. 792, 802 (1973); see Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209 (1999)(NJLAD's burden-shifting analysis mirrors the one set forth in McDonnell Douglas).  The employer may satisfy such burden by introducing sufficient evidence which, taken as true, would allow the factfinder to conclude that there was a nondiscriminatory reason for the unfavorable employment decision. See Grigoletti, 118 N.J. at 103; Monaco, 359 F.3d at 300.  This burden is "relatively light."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

After the employer presents a nondiscriminatory reason, the burden of production shifts back to the employee to prove that the proffered reason was a pretext for discrimination.  Sisler,157 N.J.

at 210.  The plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  <u>Fuentes</u>, 32 F.3d at 764.  The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  <u>Id.</u> at 765 (internal citations, quotations and brackets omitted).  "Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination."  <u>Sisler</u>, at 157 N.J. at 211.

Defendant offers several legitimate business reasons for the allegedly discriminatory actions, which have not been barred by the NJLAD's statute of limitations.  Specifically, Sgro, Bassano, and Stek were transferred into the PROS section of Global Data in June 2004 because the Global Data group required more resources at the time.  <u>See</u> Wheatley's Dep. at pp. 74-75, 98-99.  Sgro, Bassano and Stek were not singled out; other members of the Global Data team were also transferred to PROS, such as Jay Amberg.  <u>Id.</u>  The insistence that Sgro work five days a week (not part time) was because every employee in Global Data, without exception, did so.  <u>See</u> Mazzeo Dep. at pp. 62; Wheately's Dep. at pp. 106-08; Whitman's Dep. at pp. 66-67.  Sgro, Bassano, and Stek were relieved of their responsibilities for corporate seminars in the summer of 2003 or 2004 because Bloomberg decided that all seminars should be run entirely by its sales department and not by Global Data.  <u>See</u> Mazzeo's Dep. at pp. 75-77.  Walker was displaced from the Creative Strategy team in September

16

2004 because the team was entirely disbanded, and by Walker's own admission, Bloomberg helped her try to find other employment within the company, although without success.  See Walker's Dep. at pp. 177-78.  Finally, Bloomberg's decision to replace Bassano's wine segment on the Money Show with ones by John Mariani was based upon Mariani's recognized credentials and expertise, which Bloomberg contrasts to those of Bassano.

In an attempt to rebut Defendant's proffered reasons, Plaintiffs offer the Court two distinct arguments.  First, Plaintiffs state in their opposition to Defendant's motion for summary judgment that younger employees were treated better than employees that were older.  To support that contention, they cite to a specific isolated example of misreporting on a story regarding Emulex by an unidentified allegedly similarly situated younger reporter.  Plaintiffs' Opposition at pp. 12-13. Plaintiffs assert that this younger reporter, as well as others (also unidentified), were never transferred out of Bloomberg News, unlike Sgro, Bassano and Stek who were transferred out of Lifestyles because of the misreporting on the Cuban cigar story; further, Plaintiffs were "forced" to perform demeaning jobs such as compiling the "Death List" or typing a "1" in front of numbers in Global Data.  To the extent that Plaintiffs offer this comparison to rebut Defendant's employment actions prior to February 2003, they are time barred from doing so.  To the extent that Plaintiffs offer these examples to show that Defendant had a general discriminatory intent, the evidence falls short of rebutting Defendant's legitimate reasons because Plaintiffs fail to specifically address each of the alleged acts which would show by a preponderance of the evidence weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's proffered legitimate reasons.[10]

---

[10]Each Plaintiff in his or her own testimony also offers certain reasons why he or she believes Bloomberg discriminated against Plaintiffs because of their age.  For example, Sgro states that Plaintiffs were victims of a "setup", and that Bloomberg wanted to get rid of them, the

Moreover, Plaintiffs have failed to show that the only employees working on these tasks were older.

Additionally, Plaintiffs point to the testimony of Matthew Brown, a former Bloomberg employee.   Plaintiffs essentially use Brown's testimony to show that Bloomberg, or more specifically, Brown's boss, Lori Oliveri, "systematically eliminated" older workers from the company.  Brown started working in Bloomberg's recruiting department in early 2004, and Oliveri was his supervisor.  Brown testified that when Oliveri would declare someone was "not a fit," she was referring to the applicant's age.  Coupled with the fact that Oliveri was responsible for approving intra-company transfers, Plaintiffs argue that this type of alleged discriminatory practice

---

older employees, by placing them in demeaning positions.  See Sgro's Dep. at pp. 57-63.  Next, Bassano asserts that Bloomberg's bad faith was self-evident, and that he thought the alleged discrimination he faced was a pervasive company policy, which couldn't be attributed to anyone in particular.  That was his impression.  See Bassano's Dep. at pp. 149, 207.  In addition, Stek makes similar claims about Bloomberg's alleged discrimination by stating that it was hard for her to describe and that she always had a feeling that the atmosphere at work made her believe that Bloomberg held her and her group in contempt because they were all over 40 and 50.  Stek further claims that younger people who have made mistakes did not suffer the same consequences as compared to the older employees.  See Stek's Dep. at pp. 54-56, 116-17. Finally, Walker testifies at one point she was discouraged by Bloomberg from applying for a job transfer because the head of department told her that she was "looking for new blood," which Walker interpreted as implying "that I was not fresh blood, that I was old blood, rather than young blood."  See Walker's Dep. at pp. 72-73.  The Court finds that Plaintiffs' testimonies are insufficient to rebut Defendant's legitimate business reasons. "Comments that do not relate to age on their face cannot by their nature constitute direct evidence of age discrimination."  Feraro-Bengle v. Randstad N. Am., L.P., No. 03-1650, 2006 WL 2524170, at *5 (D.N.J. Aug. 30, 2006). Moreover, mere speculation is insufficient to raise a genuine issue of material fact that the employer's proffered non-discriminatory reasons are pretextual.  Barber v. Univ. of Med. and Dentistry of N.J., 118 Fed. Appx. 588, 591 (3d Cir. 2004)(dismissing claim because the plaintiff "may speculate that [discrimination played a role in the employment action], but . . . [the plaintiff] has not put forth any evidence from which the Court can infer that a frank evaluation of qualifications did not fully motivate the [employment action]"(internal quotations omitted)); see also Jordan v. Allgroup Wheaton, 218 F. Supp. 2d 643, 651 (D.N.J. 2002)(summary judgment granted because "[p]retext cannot be established based on speculation and mere conclusory allegations"(internal quotations and citations omitted)).  Here, the Court concludes that all four Plaintiffs' testimonies amount to mere speculation that are not supported by the evidence in the record.

is sufficient to rebut Defendant's legitimate business reasons.  The Court disagrees.

Brown's testimony is irrelevant to the alleged discriminatory acts against Plaintiffs.  Brown testified that Bloomberg News had its own hiring process in which neither Oliveri nor he was involved.  See Brown's Dep. at pp. 49-50.  In fact, with the exception of Walker, Plaintiffs failed to point to any evidence in the record to show that anyone at Bloomberg used "not a fit" when speaking to Sgro, Bassano or Stek.  See Sgro's Aff. at ¶ 17; Stek's Aff. at ¶ 11.  While the Court recognizes that based on the recent Supreme Court holding in Sprint/United Management Co. v. Mendelsohn, 128 S. Ct. 1140 (2008), testimony by nonparties alleging discrimination at the hands of supervisors of the defendant company who played no role in the adverse employment decision challenged by the plaintiff employee may be probative in the employment discrimination context, nevertheless, Brown's testimony is insufficient to show discriminatory intent.  Id. at 1141.  The Menhelsohn court advised that "[t]he question whether evidence of discrimination by other supervisors is relevant in an individual [age discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."  Id. at 1147.  Here, even taking Oliveri's bias as true, there is no indication that Oliveri had any connections to Plaintiffs' supervisors or Plaintiffs themselves.  In fact, there is nothing in the record to show that she was involved in any of the hiring decisions or transfer decisions involving Plaintiffs.  Without any such showing, Oliveri's alleged discriminatory practice is simply immaterial to the Court's determination whether Defendant's proffered reasons were a pretext for discrimination.  Even the indication that Oliveri was responsible for intra-company wide transfers cannot show that she actually made any decisions to approve or disapprove any of Plaintiffs' transfers.  Plaintiffs had the opportunity for discovery and have come up short.  The Court will not infer facts that are not

supported by the record.  Parker v. Royal Oak Enters., 85 Fed. Appx. 292, 294 (3d Cir. 2003); See,

e.g., Foster v. New Castle Area School Dist., 98 Fed. Appx. 85, 87 (3d Cir. 2004)(alleged remarks

made by individuals who played no role in the decisions being challenged as discriminatory do not

support an inference of discrimination (citing Gomez v. Allegheny v. Health Servs., 71 F.3d 1079,

1085 (3d Cir. 1995)).[11]

Indeed, the only plaintiff who had any direct contact with Oliveri was Walker.  However,

Walker testified that she met with Oliveri in 2002 and had a telephone conversation with Oliveri in

2004.  Walker further testified that in 2002, Oliveri passed her name on to the head of the Creative

Services team, as she said she would do; and in 2004, Oliveri told Walker that she did not know of

any open positions at the time, but would get back to her if she learned of any.  See Walker's Dep.

at pp. 70-72, 173-76.  In sum, Walker's testimony falls short of linking Oliveri to any of the positions

to which Walker attempted to transfer.  The record simply does not support the fact that Oliveri was

a decision maker in the employment decisions that were made with respect to Walker, or any of the

other plaintiffs.[12]  Accordingly, the Court finds that Plaintiffs have failed to rebut Defendant's

---

[11]Neither party discusses Brown's testimony regarding Whitman, Plaintiffs' supervisor at Global Data.  Brown testified that Whitman was also involved in some of the recruiting events. Brown further testified that he had reasons to believe that Whitman participated in discriminating against older applicants.  Brown's Dep. at pp. 75-77.  However, Brown candidly conceded that he did not have any actual knowledge of Whitman discriminating against older people.  Brown's Dep. at pp. 78-79.

[12]The Court finds discrepancies between Walker's deposition and her Affidavit on this motion.  While Walker testified at her deposition that she and Oliveri only casually met and that Oliveri offered to assist her in finding a position within Bloomberg, Walker states in her Affidavit that Oliveri interviewed her when she applied for certain positions at Bloomberg. Walker's Aff. at ¶ 6.  It is permissible for a district court to disregard a contradictory affidavit for purposes of whether there is a material dispute of fact.  Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988).  Accordingly, the Court will disregard Walker's attempt to contradict her deposition in her opposition to the summary judgment motion.

legitimate business reasons.

### C. Retaliation

An employee must prove three elements to establish a <u>prima facie</u> case of retaliation under the NJLAD (1) that she engaged in a protected activity known to the employer, (2) that she thereafter was subjected to an adverse employment decision by the employer; and (3) that there was a causal link between the two.  <u>See</u> <u>Viggiano v. State of New Jersey</u>, 136 Fed. Appx. 515, 517 (3d Cir. 2005)(citing <u>Weston v. Commonwealth of Pennsylvania</u>, 251 F.3d 420, 430 (3d Cir. 2001)).  If the plaintiff establishes a <u>prima facie</u> case of retaliation, the employer must come forward with a legitimate, non-retaliatory reason for the adverse employment action.  <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 n.2 (3d Cir. 1997).

Plaintiffs list the following protected activity: Stek's complaints to McCorry about the reduction of writing responsibilities of the group following the September 11th attacks in 2001 and early 2002; Stek's attempt to complain to Neary about her age-related concerns in 2002, that was met with sexual harassment by HR; Bassano complained in writing to management that he had been singled out because of his age in 2002 and 2004; Sgro's involvement in filing this suit in 2005; and Walker's challenge to Bloomberg's denial of her reasonable accommodation in 2004.  Because the Court has already found that the two-year statute of limitations is applicable, alleged retaliatory acts prior to February 2003 are time barred.  As such, the Court will only discuss those allegedly retaliatory acts that are within the statutory time frame of the NJLAD.

First, in a July 2004 email to Wheatly, Bassano voiced his suspicion that he was a victim of discrimination.  <u>See</u> Bassano's Email dated 7/27/2004.  Bassano alleges that after he complained,

he was stripped of his seminar duties sometimes in 2004 and radio appearances in February 2004.[13] But Bassano does not point to any evidence to establish a causal relationship between the identified protected activity and the adverse employment actions, and neither could he; the undisputed facts show that the alleged adverse employment action occurred before Bassano made the complaint (i.e., replacement of Bassano in February 2004).  Moreover, because Bassano does not indicate the exact date when Bloomberg took him off of the seminar duties, he has failed to demonstrate any temporal proximity between the two events.  Rather, the Court is left to guess that Bassano's complaint led to the alleged adverse employment decision taken against him.  Valdes v. Union City Bd. of Educ., 186 Fed Appx. 319, 324 (3d Cir. 2004)(affirming summary judgment for employer on retaliation claim where "nothing in the record . . . support[ed] a finding of a causal connection between" formal complaint and subsequent termination of employment).  Even assuming Bassano could establish his prima facie case – which may be factually impossible – as explained supra, Bassano has failed to rebut Defendant's proffered legitimate business reasons that caused it to relieve Bassano of his seminar duties in 2004 and the decision to replace Bassano's wine segment on the "Money Show." Accordingly, this retaliation claim fails as a matter of law.

Second, Plaintiffs contend that because of the initiation of the instant suit, Bloomberg retaliated against Sgro by terminating him.  Plaintiffs further argue that Sgro had been working a part time position at Bloomberg for almost 15 years; however, three weeks after the filing of this lawsuit, Bloomberg terminated him.  As the Third Circuit has explained, the closeness in temporal proximity

---

[13]The parties dispute the date on which Plaintiffs were "stripped" of their seminar duties. Defendant asserts that in June 2003, Bloomberg's New York office completely took over the seminars.  However, Plaintiffs assert that they continued to be involved in the seminars until 2004.  For the purpose of this motion, the Court views the facts in the light most favorable to Plaintiffs.  As such, the Court will use Plaintiffs' date.

between the adverse employment action and the protected activity satisfies the causal connection requirement.  Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)("temporal proximity between the protected activity and the termination is [itself] sufficient to establish a causal link").  As such, Sgro has established a prima facie case for retaliation for this particular claim.  For its legitimate business reason, Defendant contends that Sgro was terminated because he was insubordinate by refusing to work a full time schedule, since every other member of the Global Data group was working full time.  Beginning in summer 2004, months before Sgro filed the Complaint, Sgro's managers and Human Resource workers repeatedly requested that he work a full time schedule.  As late as several days before Sgro filed the Complaint, HR representatives had warned Sgro that his continued refusal to work full time would subject him to action up to and including termination of his employment.  To rebut Defendant's proffered legitimate reason, Sgro simply reargues the suggestive temporal proximity between the two events.  As such, he has failed to rebut Defendant's legitimate reason.  Therefore, Defendant's motion for summary judgment is granted with respect to this claim.

Finally, Plaintiffs contend that in February 2003, a member of Bloomberg's HR department asked Walker to provide supplemental medical documentation in order for Bloomberg to continue to accommodate her disability by excusing her from the Goal Call program.  However, Walker objected to the request and never provided any additional documentation.  As a result, Walker claims that her challenge to Bloomberg's request was met with retaliatory refusals to transfer, threats that she would be placed back on the calling program and other "depraved and mind-erasing assignments."  Plaintiffs' Opposition at p. 11.  Based on the record and Walker's own testimony, she has failed to establish a prima facie case for retaliation.

Although Walker has met the first element by engaging in a protected activity of requesting reasonable accommodation for her alleged handicap, she fails to meet the second and third elements. Based on Walker's testimony, even after her refusal to provide additional medical documentation in February 2003, she was not put back on the call program. However, Walker argues that she was nonetheless subjected to "anxiety-provoking circumstances" or threats of being put back on the program. Walker's Dep. at p. 198. Since mere threats of <u>termination</u> do not rise to the level of an adverse employment action, <u>see</u> <u>Schofield v. Metro. Life Ins. Co.</u>, 252 Fed. Appx. 500 ( 3d Cir. 2007); <u>Leitch v. MVM, Inc.</u>, No. 03-4344, 2004 U.S. Dist. LEXIS 14307, at *29-30 (E.D. Pa. Jul. 22, 2004), certainly, a threat of a troubling job assignment cannot rise to that level.

Next, Walker argues that when the Creative Strategy team disbanded in September 2004, almost a year after she was excused from the call program, Bloomberg did not assist her in transferring to another position within the company. To the extent that Walker argues that Bloomberg did not assist her, that is not an adverse employment action because this failure to assist is not "materially adverse" which may "dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2415 (2006).[14] Even if this conduct qualifies as an adverse employment action, Walker fails to establish a causal connection between Bloomberg's refusal to provide assistance and the request for accommodation for her disability. In fact, to the contrary, Walker testified that her immediate supervisor, Ms. Gross, did not treat her any differently after she was excused from the call program. Walker's Dep. at pp. 197-198. Moreover, as discussed <u>supra</u>, Walker has failed to rebut Defendant's

_____

[14]Notwithstanding Walker's argument, she testified during her deposition that Bloomberg did indeed assist her in trying to find a position within the company, but without success. Walker's Dep. at pp. 149-50, 163-70, 177-78.

legitimate business reason to disband the Creative Strategy team.  Therefore, summary judgment is granted to Defendant on this claim.

## II.  Plaintiff Walker's Failure to Accommodate Claim under the NJLAD

To establish a <u>prima facie</u> case for failure to accommodate under the NJLAD, Plaintiff must prove she (1) was handicapped; (2) was qualified to perform the essential functions of the job, with or without accommodation, and (3) suffered an adverse employment action because of the handicap. <u>Bosshard v. Hackensack Univ. Med. Ctr.</u>, 245 N.J. Super. 78, 91 (App. Div. 2001)(citations omitted); <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 150 (3d Cir. 2004).

Walker has failed to establish her <u>prima facie</u> case.  Not only has Walker failed to demonstrate, or even address, that she was handicapped and that she was qualified to perform the essential functions of the job, she has not shown that she suffered an adverse employment action. Walker's claim is based entirely on the fact that, after excusing her from the Goal Call program in 2002 due to her anxiety disorder, Defendant subsequently asked her to provide updated medical information as to her condition.   The request itself is insufficient to qualify as an adverse employment action.  Indeed, Walker has acknowledged that Defendant dropped the request upon her objection, as discussed earlier in this Opinion, and that she was never put back on the call program. In any event, the request was consistent with the statutory framework of the NJLAD.  Under the NJLAD, Defendant must engage in an interactive process with  Walker to determine employee's limitations and potential reasonable accommodations.  <u>Tynan v. Vicinage 13 of Superior Court</u>, 351 N.J. Super. 385, 400 (App. Div. 2002).  Accordingly, because Walker has failed to establish a <u>prima facie</u> case for failure to accommodate, her claim is dismissed.

### III.  Plaintiffs' Hostile Work Environment Claim under the NJLAD

Having previously outlined the statute of limitations for claims of discrimination and retaliation, the Court will now analyze whether the continuing violation doctrine applies in the context of Plaintiffs' hostile work environment claim.  There is "a natural affinity" between the theory underlying hostile environment claims and the continuing violation theory.  Rush v. Scott Specialty Gases, 113 F.3d 476, 482 (3d Cir. 1997).  Hostile work environment often "results from acts of . . . harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment." Id (quotations and citations omitted).  The Supreme Court in Morgan explained:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative [effect] of individual acts.
>
> . . .
>
> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile

work environment claim and a charge may be filed at a later date and still encompass the whole.

Morgan, 536 U.S. at 114-18 (citations and footnotes omitted).

Subsequently, the New Jersey Supreme Court, in Shepard v. Hunterdon Development Ctr., adopted the Morgan approach to hostile work environment claims.  Shepard, 174 N.J. at 20-21. In doing so, the Shepard court posed two questions for courts to consider: "have plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants?" Id. at 21.  If yes, then their cause of action would have accrued on the day on which those individual acts occurred.  Id.  Second, "have plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment?"  Id.  If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding that some of the component acts of the hostile work environment claim have fallen outside the statutory time period.  Id. (citations omitted).

In addition to the standard set forth in Shepard and Morgan, the Third Circuit also outlined certain factors for courts to consider when determining whether the doctrine is applicable: (1) subject matter - whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency - whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence - whether the act had a degree of permanence which would trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal quotations and citations omitted). "The consideration of 'degree of permanence' is the most important of the factors."  Id (internal

quotations and citations omitted).

With these principles in mind, the Court concludes that Plaintiffs' allegations fall under the hostile work environment rubric as set forth in Morgan and Shepard.  Accordingly, Plaintiffs' cause of actions accrued on the date of the last act in the pattern or series of acts that comprise the continuing violation claim (i.e., Sgro's eventual termination in 2005; Defendant's alleged treatment of Walker in 2004; Stek's allegations of performing menial work in Global Data before her leave in May 2003; and Bassano's transfer to the PROS team within Bloomberg in 2004).  See, e.g., Rush, 113 F.3d at 482 (holding that a pattern of derogatory remarks, rude behavior, and other acts of sexual harassment constituted a continuing violation); Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994)(holding that acts of race-and gender-based harassment constituted a continuing violation that did not end until the plaintiff was driven from her job); Anthony v. County of Sacramento, 898 F. Supp. 1435, 1446 (E.D. Cal.1995)(holding that racial and sexual slurs, racist cartoons, flyers, and graffiti over a five-year period and involving numerous perpetrators constituted a continuing violation); Wilson, 158 N.J. at 274 (holding that a supervisor's crude and indecent remarks and insistence that the plaintiff wear a brassiere could constitute an ongoing violation).

Nevertheless, Defendant contends that because each Plaintiff expressed some awareness that he/she was being discriminated against at an early date, the continuing violation doctrine does not apply.  To support its contention, Defendant argues that Sgro testified that, by July 2001, he concluded that Bloomberg was discriminating against him and that Bassano expressed in a 2002 self-evaluation his suspicion of age-based discrimination.  In sum, Defendant argues that the alleged discriminatory events in 2001 and 2002 triggered Plaintiffs' awareness of, and duty to, assert their rights for all outstanding events.  However, Defendant's argument has been expressly rejected by the

28

New Jersey Supreme Court.  Indeed, the <u>Shepard</u> court held that "a victim's knowledge of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based."  <u>Shepard</u>, 174 N.J. at 22.  As such, the Court will consider events that occurred before February 2003 for the purpose of Plaintiffs' hostile work environment claim.

Nonetheless, even considering all of the actions alleged by Plaintiffs, they fail to establish a claim of hostile work environment.  To establish a cause of action under the NJLAD based on a hostile work environment, Plaintiffs must satisfy each part of a four-part test. <u>See</u> <u>Shepard</u>, 174 N.J. at 24.  Specifically, they must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. <u>Lehmann v. Toys 'R' Us, Inc.</u>, 132 N.J. 587 (1993).  "Within that framework, a court cannot determine what is 'severe or pervasive' conduct without considering whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile."  <u>Shepard</u>, 174 N.J. at 24; <u>Lehmann</u> 132 N.J. at 604.  Thus, the second, third, and fourth prongs are, to some degree, interdependent. <u>Id.</u>

Under the first prong of the test, "a plaintiff must show by a preponderance of the evidence that the impermissible conduct would not have occurred but for plaintiff's protected status."  <u>Id.</u> Defendant contends that Plaintiffs have failed to meet this element because they merely speculate that they were the victims of a discriminatory and retaliatory hostile work environment, but offer no evidence to support their claims of an illegal animus.  On the other hand, Plaintiffs assert that they repeatedly asked to be transferred to other positions within the organization, but were told that they

were not qualified.  Plaintiffs also contend that it is Bloomberg's policy to discriminate against older employees.  To support their contention, they offer Brown's testimony.  Brown testified that "there were two phrases that were used interchangeably to get the point across that [applicants or employees] were too old.  One was 'they're not a fit' or 'they don't fit the image' and the other would be 'we can't pay them enough,' the presumption being that if they had ten years of experience they would be asking for a certain salary level that we couldn't pay in that department."  Brown's Dep. at p. 134.  When asked what made him think that when someone used the term "not a fit" he/she were referring to age, Brown answered:

> A:   I've been scolded on multiple occasions for sending someone that was too old, who, even if they acted or looked the same as everyone else that was there, their age and corresponding work experience, was too high.  There were times when . . . Lori [Oliveri] or someone else would come out of an interview and make like a "ick" face, like "yuck" and throw a resume away.  I, I witnessed leafing through resumes and throwing away ones that were too old, without even meeting people, after they had been called back by a recruiting event.  Not a fit.

Brown's Dep. at pp. 135-36.  However, as discussed at length <u>supra</u>, Brown and Oliveri were not involved in the any of the decisions to transfer, or not to transfer, Plaintiffs.  Indeed, even assuming that Oliveri had a bias against older employees/applicants, this fact fails to establish the casual connection of the alleged hostility in this matter and Plaintiffs' age.  Moreover, Brown's speculative attribution of age-related meaning to the term "not a fit" does not raise a material issue of fact since "subjective perceptions and personal opinions," without supporting evidence are insufficient to sustain a NJLAD claim.  <u>Camper v. Whelan</u>, 2006 WL 3093689, at *4 (N.J. Super. App. Div., Sep. 27, 2006); <u>Mandel v. UBS/PaineWebber, Inc.</u>, 373 N.J. Super. 55, 79 (App. Div. 2004)("'Perception,' like 'speculation' and 'suspicion' cannot support a cause of action").

Accordingly, Plaintiffs have failed to establish that any hostility towards them was motivated by their ages.  See, e.g., Johnson v. Bally's, No. 03-3126, 2006 WL 1644861, at *3 (D.N.J. Mar. 30, 2007)(granting summary judgment on hostile work environment claim where plaintiff failed to "put forth any evidence, other than bare allegations, that Defendant's conduct was related to Plaintiff's race"); Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *5 (D.N.J. 2006)(dismissing hostile work environment claim because "[t]he Plaintiff has utterly failed to present any competent evidence to show that the allegations [of hostile actions] are in any way connected to his race").  Importantly, as has been explicated in this Opinion, Plaintiffs fail to create a genuine issue of material fact regarding any of their age-based claims because they do not point to facts or events which show that Defendant's actions were directed at older employees as opposed to all employees.  Instead, Plaintiffs allege multiple incidents and, without evidentiary support, assert that these acts committed by Defendant were based on an illegal discriminatory animus.  On a motion for summary judgment, these baseless allegations do not warrant any merit.  Rather, time and time again, the undisputed material facts show that the proclaimed menial and demeaning tasks were performed by many employees, and not just Plaintiffs; and most importantly, Plaintiffs' transfers within Bloomberg were based on legitimate business reasons, and Plaintiffs fail to show otherwise.

Furthermore, Plaintiffs have failed to satisfy the second element of the test.  The following cases outline the contours of the "severe or pervasive" requirement: Taylor v. Metzger, 152 N.J. 490, 502-03 (1998) (concluding that patently racist slur spoken publicly by supervisor to subordinate created jury question on whether comment was sufficiently severe); Heitzman v. Monmouth County, 321 N.J. Super. 133, 148 (App.Div.1999) (concluding that anti-Semitic comments did not constitute severe or pervasive conduct because they were casual, sporadic, and did not involve any physical

threat); Leonard v. Metropolitan Life Insurance Co., 318 N.J. Super. 337, 345 (App. Div.1999) (concluding that comments about plaintiff's disability uttered by supervisor created genuine issue of material fact on severe or pervasive requirement); Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 270-71(App.Div.1996)(concluding that jury question existed on "severe or pervasive" requirement in case in which plaintiff alleged that supervisor "frequently" said to her, "you're a woman and a pain in my ass," that supervisor called plaintiff a "loser" about "once or twice a week," and that he said to her "you're so emotional, it must be PMS time" about "twice a month").

Plaintiffs argue in a conclusory manner that the entire Bloomberg apparatus was geared toward purging its ranks of older workers.  They assert that Bloomberg rounded them up, disbanded them, refused multiple requests for transfers along the way, and forced Plaintiffs into positions specifically calculated to elicit mental distress or voluntary resignation.  More specifically, Plaintiffs argue that the menial and demeaning assignments (i.e., adding "1" in front of phone numbers at Global Data and compiling the "Death List") "destroyed their basic psychological health and human dignity."  When read in its entirety, the crux of Plaintiffs' inflammatory complaints is that they were not permitted to perform in a capacity that matched their experience and background.  However, Plaintiffs ignore evidence that other employees in their groups were asked to perform the same necessary tasks – even their supervisor Whitman.  While the Court recognizes that Plaintiffs may have been demoted from past positions because of certain corporate structural changes within Bloomberg or for other nondiscriminatory reasons, such changes simply do not amount to the pervasive and severe conduct that is required for a hostile work environment claim.  See Shepherd, 336 N.J. Super. at 416 (observing that "[n]either rudeness nor lack of sensitivity alone constitutes harassment, and simple teasing, offhand comments, and isolated incidents do not constitute

32

discriminatory changes in the terms and conditions of one's employment").  Accordingly, having

determined that the alleged hostility towards Plaintiffs was not severe and pervasive and that

Plaintiffs failed to show such hostility was due to their ages, summary judgement is therefore

appropriate on this claim.[15]

### IV.  Plaintiffs' Intentional Infliction of Emotional Distress Claims

To establish "an intentional infliction of emotional distress claim under New Jersey law, a

plaintiff must show (1) that the defendant intended to cause emotional distress, (2) that the conduct

was extreme and outrageous, (3) that the actions proximately caused emotional distress, and (4) that

[plaintiff's] emotional distress was severe."  Ferraro v. Bell Atl. Co., Inc., 2 F. Supp. 2d 577, 588

(D.N.J. 1998)(citing Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988)).  To satisfy

this test, the plaintiff must show conduct "so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

---

[15]Walker and Stek both alleged specific incidents that they argue constitute severe and pervasive conduct.  Walker claims that based on her disability, co-workers made a handful of unkind remarks about her exclusions from the Goal Call program.  However, such an allegation does not state a claim for hostile work environment because "[a] hostile work environment discrimination claim cannot be established by epithets or comments which are merely offensive," and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Mandel, 373 N.J. Super. at 73 (internal quotations and citations omitted).  Stek claims that the sexually harassing remarks made by Neary in late 2001 and early 2002 were part of a campaign of retaliation for her age discrimination complaints.  However, Stek's own testimony contradicts her assertion.  During her testimony, Stek makes clear that there was no connection between the alleged sexual harassment and her complaints.  She stated that Neary would allegedly make inappropriate comments which he engaged in all the time, and that was his "modus operandi." Stek's Dep. at pp.155-159.  Even taking those comments as true, Stek fails to show that the comments were relevant to the hostility towards her age.  Indeed, the true nature of those comments may have supported a sexual harassment claim, which the Court has found is time-barred.

in a civilized community." Buckley, 111 N.J. at 366 (internal quotations and citations omitted). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23-24 (App. Div. 2001)(internal citations and quotations omitted).

In this claim, Plaintiffs essentially recite every single Defendant's act mentioned in their retaliation and discrimination claim as outrageous conduct. As the Court has already discussed these incidents in detail, it will not recite them here. Bloomberg's alleged conduct simply does not rise to the level of extreme degree that goes beyond all possible bounds of decency. Moreover, Plaintiffs argue that since one of them is totally disabled and the others have suffered various degrees of psychiatric injury, their litany of alleged abuses raise genuine issues of material fact as to the nature and severity of the conduct at issue. Such argument is misplaced. The standard for this claim is not the degree of Plaintiffs' emotional distress, but rather, whether Defendant's conduct could be deemed as outrageous. Plaintiffs have made no such showing nor did they provide any legal support for their assertions. Accordingly, summary judgment is appropriate.[16]

---

[16]Plaintiffs in their opposition to Defendant's motion for summary judgment argue in the alternative that Defendant's conduct may support a claim for negligent infliction of emotional distress. Since Plaintiffs failed to plead this particular claim in their Complaint, the Court will not consider it. Bey v. Daimler Chrysler Servs. of N. Am., LLC, No. 04-6186, 2006 U.S. Dist. LEXIS 8261, at *33 (D.N.J. Feb. 15, 2006) ("claims [that] were not alleged in the complaint [] cannot be raised for the first time in opposition to a motion for summary judgment); see, e.g., Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)"); Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"); Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990).

**CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment is granted in its entirety.

Dated: March 31, 2008

/s/   Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

35